UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-81136-CIV-COHN/SELTZER

FERN MARTIN,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of
Social Security,

        Defendant.

_____/

## REPORT AND RECOMMENDATION TO DISTRICT JUDGE

I.    INTRODUCTION

THIS CAUSE is before the Court on the cross-motions for summary judgment [1] filed,

respectively, by Plaintiff Fern Martin ("Claimant") and by Defendant Michael Astrue,

Commissioner of Social Security ("Commissioner"). The motions were referred to United

States Magistrate Judge Barry S. Seltzer pursuant to Magistrate Rules 1(c) and (d), Local

Rules of the United States District Court for the Southern District of Florida.

The cross-motions present the following issue: whether there exists substantial

evidence to support the determination by the Administrative Law Judge ("ALJ") that

Claimant retains the capacity to perform her past relevant work and, therefore, is not

disabled. The undersigned concludes that substantial evidence does support the ALJ's

---

[1] Although other circuits have found the summary judgment device inappropriate for deciding cases under the Social Security Act, see, e.g., Igonia v. Califano, 568 F.2d 1383, 1389 (D.C. Cir. 1977), the Eleventh Circuit has deemed it appropriate where the district court has reviewed the record and based its judgment on a finding of substantial evidence in the administrative record. See Lovett v. Schweiker, 667 F.2d 1, 2 (5th Cir. 1981).

determination. Accordingly, the undersigned RECOMMENDS that Plaintiff's Motion for Summary Judgment (DE 10) be DENIED, that Defendant's Motion for Summary Judgment (DE 13) be GRANTED, and that the Commissioner's decision be AFFIRMED.

II.   PROCEDURAL HISTORY

Claimant applied for Disability Insurance Benefits ("DIB") on May 8, 2006, alleging disability as of May 24, 2005. Tr. 10, 84-88. In her Disability Report, she alleged disability due to knee and back pain. Tr. 98. The application was denied initially and upon reconsideration. Tr. 10, 68-77. Thereafter, Claimant requested and was granted a hearing before an ALJ, which was held on January 8, 2008. Tr. 10, 16-48. On March 25, 2008, the ALJ issued his decision, finding that Claimant was not under a "disability," as defined in the Social Security Act, from May 24, 2005, through the date of the decision. Tr. 10-15. On June 26, 2009, the Appeals Council of the Social Security Administration denied Claimant's request for review, which left the decision of the ALJ standing as the final decision of the Commissioner. Tr. 1-3.

On August 5, 2009, Claimant filed a Complaint commencing the instant action. (DE 1). On October 27, 2009, the Commissioner filed an Answer (DE 7). On December 1, 2009, Claimant filed Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law (DE 10), and on January 15, 2010, the Commissioner filed Defendant's Motion for Summary Judgment with Supporting Memorandum of Law (DE 13).

The matter is now ripe for review.

III.   SUMMARY OF RECORD EVIDENCE

The undersigned has reviewed the Statement of Facts contained within Defendant's Motion for Summary Judgment (DE 13) and finds that it fairly and accurately summarizes

2

the relevant portions of the administrative record.

### 1. Background

In her application for disability benefits, Plaintiff stated she was born in 1947, and alleged a disability onset date of May 24, 2005, when she was 57 (Tr. 84). In her Disability Report, she alleged disability due to knee and back pain (Tr. 98). Plaintiff completed the 11th grade and had worked from 1970 until 2005, for a telephone company, as a data entry worker and a frame attendant, earning about $60,000 per year (Tr. 99, 105-06).

### 2. Summary of Medical Evidence

Plaintiff had a history of problems with both knees; she underwent a total knee replacement in 1999, a left total knee arthroplasty revision in May 2007, and had been treated for degenerative joint disease in the right knee (Tr. 151-65, 198-217, 221-389, 392-99).

In May 2005, Plaintiff followed up with Harvey Montijo, M.D., her treating orthopedic surgeon, who had performed her left knee replacement in 1999 (Tr. 164). Plaintiff reported progressive pain in her right knee, as well as weakness and cramping in her lower extremities (Tr.164). She denied any loss of bowel or bladder control (Tr. 164). Dr. Montijo noted her medical history consisted of only hypertension (Tr. 164). X-rays of the lumbar spine from May 2005, showed some degenerative disc disease with degenerative spondylosis in the lumbar spine (Tr. 165). X-rays of the right knee showed tri-compartmental osteoarthritic changes (Tr. 165). X-rays of the left knee showed good placement of the left total knee arthroplasty without evidence of loosening, wear, or malalignment (Tr. 165). Dr. Montijo indicated she could work full duty as tolerated with her only restrictions being no ladders and no climbing of stairs (Tr. 165).

In [July][2] 2005, Dr Montijo noted that an MRI of Plaintiff's lower back was unremarkable (Tr.159). X-rays of the right knee showed varus osteoarthritis, with narrowing of the medial joint space, subchondral sclerosis, and osteophyte formation (Tr.

---

[2] The undersigned has bracketed minor corrections to the Statement of Facts.

160). Dr. Montijo recommended work restrictions of permanent light duty, including no kneeling, squatting, crawling, crouching, climbing ladders, and unprotected heights (Tr. 162). No findings of obesity or restrictions related to obesity were noted (Tr. 162). [In June 2005], Dr. Montijo noted that Plaintiff was extremely large breasted, but not morbidly obese (Tr. 160). He felt it was medically necessary for her to consider breast reduction surgery due to the increased stress on the spine (Tr. 161).

In July and August 2005, Plaintiff had a series of five injections into her right knee (Tr. 152-59). After completing the series of injections, Plaintiff reported a 60 to 70 percent improvement in knee pain (Tr. 152). She denied any [adverse reactions]. (Tr. 152). X-rays of her right knee taken August 2005, showed the same findings of earlier x-rays (Tr. 156). Her left knee was noted to be in "good order" with some slight radiolucency noted along the tibial tray (Tr.156).

At a follow-up visit in October 2005, Dr. Montijo stated Plaintiff was doing very well (Tr.151). She denied any complications (Tr. 151). Upon physical examination, Dr. Montijo noted Plaintiff's right knee had full range of motion without limitations and without pain to endpoints (Tr.151). He noted there were no instability signs or no meniscus tear signs (Tr. 151). Patellofemoral tracking and neurovascular examination were both normal (Tr. 151).

In March 2006, Plaintiff met with a nurse practitioner for a check-up and prescription refill (Tr. 166). Plaintiff complained of bilateral shoulder and back pain (Tr. 166). The nurse practitioner noted Plaintiff had a history of hypertension, degenerative joint disease in her right knee, and degenerative disc disease in her back (Tr. 166). The practitioner did not note a history of obesity; however, [the practitioner] did note Plaintiff's shoulders and spine were impacted by her breast size (Tr. 166).

Jorge Roberto Abad, M.D., performed a consultative examination of Plaintiff in July 2006 (Tr. 169-72). She reported that she had been diagnosed with hypertension in 1993, for which she took medication (Tr. 169). She also reported total left knee replacement in 1999, after which she did well until 2004 (Tr. 169). She reported lower back pain for the previous five years [Tr. 169]. Plaintiff stated she could alternate between

4

standing for 15 to 20 minutes at a time and sitting for 30 minutes at a time (Tr. 169). She stated she could lift 10 to 15 pounds, walk up to 1 city block, and climb 2 to 3 steps of stairs (Tr. 169). She stated she could drive a car, and do some household chores, including washing dishes, cooking, and shopping (Tr. 169). Upon physical examination, Plaintiff's blood pressure was 130/90 (Tr. 171). Her height was 66 inches and she weighed 226 pounds (Tr. 170). Physical examination revealed no limits in range of motion or lumbar spine flexion (Tr. 171). Straight leg raise was negative (Tr. 171). She had full range of motion of her lumbar spine and right knee (Tr. 171). She had decreased range of motion in the left knee, but no other neurological deficits (Tr. 171). There was no evidence of atrophy or weakness in any of the extremities (Tr. 171). Dr. Abad noted Plaintiff's [use of a cane, as she was limping towards the left side.] (Tr. 171). She could get on and off the examining table with mild difficulty and get up and out of the chair without assistance (Tr.171). She was able to walk on her heels, walk on her toes, and was able to do heal-to-toes, and squat (Tr. 171). Dr Abad noted Plaintiff's ability to squat was contradictory (Tr. 172).

In January 2007, Plaintiff reported to Dr. Montijo that her left knee was very unstable (Tr. 214). Physical examination showed left knee effusion and left knee instability (Tr. 214). [In February 2007], Plaintiff reported the pain started sometime in November 2006. (Tr. 212). X-rays [reveal some moderate spondylosis without evidence of spondylolisthesis]. (Tr. 210). Dr. Montijo performed left total knee arthroplasty revision in May 2007 (Tr. 221-24, 228-30). After her revision surgery, June 2007 x-rays showed her left knee prosthesis to be in good order (Tr. 207). She had postoperative wound healing difficulties with bloody fluid draining from her knee incision, and underwent closure of the fistula tract in July 2007 (Tr. 201). After this, she underwent physical therapy. (Tr. 198).

Dr. Montijo noted, in September 2007, that physical examination of Plaintiff revealed functional and pain free range of motion of the right knee (Tr. 398). Range of motion in the left knee was 0-90 degrees and was negative for instability (Tr. 398). X-rays of the right knee showed severe trico[m]partmental arthritis, with narrowing of the joint space secondary to sclerosis and osteophyte formation (Tr. 398). Dr. Montijo prescribed pain medication (Tr. 399). Later that month, Plaintiff told Dr. Montijo that her left knee was doing very well,

5

but described persistent right knee pain (Tr. 396). On physical examination, the knee was neurologically grossly intact and was tender to positive crepitus (Tr. 396). Dr. Montijo assessed right knee osteoarthritis and recommended a series of injections for her right knee (Tr. 397). He also offered Plaintiff oral medication, which she deferred (Tr. 397). Upon receiving the injections, Plaintiff reported continued improvement in her knee [Tr. 392].

### 3. Administrative Hearing

The ALJ stated at Plaintiff's administrative hearing, on January 8, 2008, that from his review of her file there were indications of degenerative disc disease, degenerative joint disease of the right knee, status post left knee replacement in 1999, obesity, hypertension, and right elbow tendinitis (Tr. 19). He noted that although Plaintiff alleged disability onset of May 2005, she continued to be employed until September 2006, and received nearly $60,000 in wages from her employer in 2006 (Tr. 20-22). Plaintiff testified that she worked from 1970 until 2005, as a data entry worker and frame attendant for a telephone company (Tr. 25). The ALJ noted that despite Plaintiff's history of obesity and a left knee replacement, which would have affected her ability to work, she continued to work as a frame attendant, which required her to climb ladders, lift heavy objects, stoop, bend, pull and stretch wire, and go up and down stairs, until 2005 (Tr. 25). Plaintiff stated that in May 2005, she could no longer do her job as a frame attendant because of back and knee pain (Tr. 25-26). After her termination, she took retirement (Tr. 23). Plaintiff reported she took pain pills and other medications (Tr. 37). When asked by her attorney if her medications, which she did not describe, had an effect that she did not like, she stated "they have effect" but did not elaborate (Tr. 37). As to her functional abilities, Plaintiff stated she could sit for 30 minutes and stand for about 15 to 20 minutes before needing to change positions, and could alternate positions in that manner throughout an 8-hour day, without having to lay down or take a nap (Tr. 29-30, 37). She stated she could tie her shoes and lift a jug of juice or milk (Tr. 35). Plaintiff testified that she had not gotten a breast reduction because the insurance company denied her claim after she "copped an attitude" (Tr. 31). When her attorney asked her if her "water pills" had any effect that she did not like, she responded that she had to "go" about four to five times per day (Tr. 31). As to her daily activities, Plaintiff

6

> reported she could drive, shop, and wash dishes, but did not
> vacuum or wash a bathtub (Tr. 33-35).
>
> Howard Feldman, Ed.D., a vocational expert, testified Plaintiff
> had past relevant work as a data entry clerk, which was
> sedentary, semi-skilled work with an SVP of 3, and as a frame
> attendant, which was medium, semi-skilled, medium work, with
> an SVP of 4 (Tr. 39, 41). He then testified in response to a
> hypothetical question posed by the ALJ, outlining Plaintiff's
> age, education, and work experience (Tr. 38-48). The
> hypothetical individual was limited to sedentary work, with
> standing and walking for a maximum of two hours, and sitting
> for at least six hours of an eight-hour work day, with
> permissible alternating between sitting and standing, and
> unlimited pushing and pulling (Tr. 43). Additionally, the
> individual would be limited to never climbing ladders, ropes,
> and scaffolds, and could occasionally perform the remainder
> of postural limitations (Tr. 43). Dr. Feldman testified that the
> hypothetical person would be precluded from performing
> Plaintiff's past work as a frame attendant, but could perform
> her past work as a data entry clerk (Tr. 44-45). He stated that
> although the position of data entry clerk was sedentary in
> nature and did allow for mainly sitting, it would also allow for
> occasional standing if a person so desired so long as they
> stayed at the work station (Tr. 44). In a final hypothetical, the
> ALJ asked Dr. Feldman to assume that the hypothetical
> claimant had every single one of the symptoms argued by
> Plaintiff and her attorney (Tr. 45). Dr. Feldman testified that
> such symptoms would not prevent the hypothetical person
> from performing as a data entry clerk (Tr. 45).

Defendant's Motion at 2-8 (DE 13).

## IV.   STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, the court's role is a limited

one. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's

findings of fact must be affirmed if they are based upon "substantial evidence."  Id.;

Richardson v. Perales, 402 U.S. 389, 401 (1971). "Substantial evidence" is evidence that

a reasonable person would accept as adequate to support the challenged conclusion.

7

Richardson, 402 U.S. at 401; Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." Bloodsworth, 703 F.2d at 1239. In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

V.    ANALYSIS

      A.    The Sequential Evaluation

A "disability" is defined as an inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can
> be expected to last for a continuous period of not less than 12
> months.

42 U.S.C. § 423(d)(1)(A). In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and (4) the claimant's age, education, and work history. Walden, 672 F.2d at 839.

To arrive at a determination as to disability, the ALJ must undertake the sequential evaluation embodied in 20 C.F.R. § 404.1520. This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If so, a finding of "no disability" is made. Id.

If the claimant is not engaged in such work, then the ALJ must proceed to the second step and determine whether the claimant suffers from a "severe impairment." An

8

impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If a severe impairment is not found, the ALJ will conclude that there is no disability; if a severe impairment is determined, the ALJ will proceed to the next phase of the analysis. Id.

The third step requires the ALJ to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations. 20 C.F.R. § 404.1520(d). If so, the ALJ will find the claimant disabled without considering age, education, and work experience. Id. If not, the inquiry will proceed to the next stage.

Step four requires the ALJ to determine whether the claimant has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. § 404.1520(e). The Regulations define RFC as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). This determination takes into account "all the relevant evidence," including medical evidence, the claimant's own testimony, and the observations of others. Id. The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that type of work. If so, the claimant is found not disabled. 20 C.F.R. § 404.1520(e).

If the claimant establishes an inability to return to past relevant work, the burden shifts to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that the claimant can perform. Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); Smith v. Schweiker, 646 F.2d 1075, 1077 (5th Cir. Unit A 1981). If the Commissioner points to possible alternative employment, the burden returns to the claimant to prove an inability to perform those jobs. Id. These shifting burdens comprise the fifth and final step, at which point the ALJ must resolve whether the

9

claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. § 404.1520(g)(1).

To help evaluate whether sufficient jobs exist that can be performed given the claimant's age, education, and physical limitations, the Commissioner has promulgated Medical Vocational Guidelines ("guidelines"). See 20 C.F.R. Pt. 404, Subpt. P, App. 2. The guidelines may be applied where a claimant is not performing substantial gainful activity and is prevented by a severe, medically determinable impairment from doing past relevant work. 20 C.F.R. § 404.1569. The guidelines are composed of detailed grids and rules which, based on a claimant's RFC, age, education, and previous work experience, direct a finding of disabled or not disabled. See Walker, 826 F.2d at 1002.

Yet, the guidelines "do not cover all possible variations of factors" and are inapplicable "if one of the findings of fact about the person's vocational factors and RFC is not the same as the corresponding criterion of the rule." 20 C.F.R. § 404.1569. The guidelines, therefore, are not applicable where the claimant is unable to "perform the full range of work required of that category on a daily basis." Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991). Further, they may not be used when the claimant suffers from significant non-exertional limitations, such as significant mental impairments. Id.; Walker, 826 F.2d at 1003. When the guidelines may not be conclusively applied, they may serve only as a framework to determine whether sufficient jobs exist within the claimant's range of RFC. Hargis, 945 F.2d at 1490. In such instances, the Commissioner must instead carry his burden through the use of a vocational expert. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); Wingo v. Bowen, 852 F.2d 827, 831 n.4 (5th Cir. 1988); Walker, 826 F.2d at 1003. A vocational expert provides the ALJ with a realistic appraisal of the work

10

a claimant is capable of performing. Walker, 889 F.2d at 50.

### B.    Application of the Sequential Evaluation by the ALJ

After considering all of the evidence before him, the ALJ concluded that Claimant retains the capacity to perform her past work as a data entry clerk and, therefore, is not disabled for purposes of the Social Security Act. Tr. 14-15.

In arriving at this conclusion, the ALJ addressed each step in the evaluative sequence.[3] He first observed that Claimant had not engaged in substantial gainful activity since her alleged onset of disability. Tr. 12. The ALJ next found that Claimant has the following "severe" impairments: "degenerative joint disease of the right knee, and she is status post left knee repair in 1999 and status post left knee total arthroplasty in May of 2007, and has hypertension (20 CFR 404.1520(c))." Tr. 12. But the ALJ further found that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. Tr. 12.

The ALJ then assessed Claimant's RFC. As part of this assessment, the ALJ considered all the evidence, including Claimant's subjective complaints. After reviewing the evidence and Claimant's testimony, the ALJ found that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible . . . ." Tr. 13. Then, after considering the entire record before him, the ALJ found that Claimant has an

---

[3] Preliminarily, the ALJ noted that Claimant had acquired sufficient quarters of coverage to remain insured through December 31, 2010. Tr. 19, 21. Accordingly, the relevant period for analysis runs from the date of the alleged onset, May 24, 2005, through the date of the ALJ's decision, March 25, 2008.

RFC to perform "sedentary work [4] . . . except that [she] can only occasionally climb ramps and stairs; balance, stoop, bend[ ] at the waist, kneel, bend[ ] at the knees, crouch, bend[ ] the legs and spine, and crawl. [She] can never climb ladders, ropes or scaffolds." Tr. 12.

Having found that Claimant is capable of performing "sedentary work," the ALJ next considered whether Claimant has the ability to perform her past relevant work as a data entry worker. Tr. 14-15. The ALJ noted that the data entry job was sedentary, unskilled work.[5] Tr. 14. Then, comparing Claimant's RFC for "sedentary work" with the physical and

_____

[4] According to the Regulations, "sedentary work" involves:

> [L]ifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a) (emphasis added). As utilized in the definition of "sedentary work":

> "Occasionally" means occurring from very little up to one third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10,1983 WL 31251, at * 5 (S.S.A) (emphasis added).

[5] At the hearing, the vocational expert testified that (Section 203.582-054 of) the Dictionary of Occupational Titles classified Claimant's past (data entry) employment "as sedentary," but he also testified that her employment was "semi-skilled" (as opposed to "unskilled"). Tr. 39.

mental demands of data entry work, the ALJ found that Claimant is able to perform her past relevant work as it is "generally performed." Tr. 14.

Given that Claimant retains the capacity to return to her past relevant work, the ALJ concluded that she "has not been under a disability, as defined in the Social Security Act, from May 24, 2005, through the date of this decision [March 25, 2008]." Tr. 15.

C.    Discussion

Claimant disputes the findings and conclusions of the ALJ. She argues that the ALJ erred by: (1) failing to address her need to urinate frequently, an alleged side effect of her diuretic medication; (2) failing to consider awarding her a closed period of disability; and (3) failing to properly evaluate her obesity. See Plaintiff's Motion at 2, 5-9 (DE 10). For the reasons set forth below, the undersigned does not find Claimant's arguments persuasive.

1.    Claimant's Urinary Frequency

Claimant first argues that the ALJ failed to consider the side effects of her diuretic medication, in particular, her need to urinate frequently. Claimant raised this matter for the first – and only – time at the administrative hearing. In response to questioning from her counsel, Claimant testified that her "water pills" cause her to urinate "through the day . . . at least four to five" times. Tr. 31. Claimant suggests that her urinary frequency so compromises her ability to work that she should be found to be disabled. See Plaintiff's Motion at 5-6 (DE 10-1).

The ALJ's assessment of subjective complaints is governed by statute, which in pertinent part provides:

An individual's statement as to pain or other symptoms shall

13

> not alone be conclusive evidence of disability as defined in this
> section; there must be medical signs and findings, established
> by medically acceptable clinical or laboratory diagnostic
> techniques, which show the existence of a medical impairment
> . . . which could reasonably be expected to produce the pain
> or other symptoms alleged and which, when considered with
> all evidence . . . would lead to a conclusion that the individual
> is under a disability.

42 U.S.C. § 423(d)(5)(A). The Eleventh Circuit has stated that an individual alleging

disabling pain must show not only evidence of an underlying medical condition, but also

either "objective medical evidence that confirms the severity of the alleged pain arising

from that condition or . . . that the objectively determined medical condition is of such a

severity that it can reasonably be expected to give rise to the alleged pain." Landry v.

Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986) (citing Hand v. Heckler, 761 F.2d 1545,

1548 (11th Cir. 1985)). "This standard also applies to complaints of subjective conditions

other than pain." Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). When this

standard is met, the ALJ must then consider a claimant's subjective complaints. Foote v.

Chater, 67 F.3d 1553, 1560-61 (11th Cir. 1995). The ALJ, however, is not required to

credit those complaints. Id. He may discount them provided he "articulate[s] explicit and

adequate reasons for doing so." Id. at 1561-62. The ultimate issue is not whether a

claimant has some pain and limitations, but whether a claimant's complaints are credible

to the extent that her pain and limitations prevent her from performing any kind of work.

See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

After evaluating claimant's subjective complaints and the accompanying medical

records, the ALJ found that although "[C]laimant's medically determinable impairments

14

could reasonably be expected to produce the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." Tr.13. Here, Claimant does not contend that the ALJ erred in assessing the credibility of her subjective complaints, just that he erred in failing to address her complaints of urinary frequency. See Plaintiff's Motion at 5-7 (DE 10-1). The undersigned does not find that the ALJ committed error in failing to address her urinary frequency.

First, aside from the isolated references at the hearing, Claimant does not identify, nor can the undersigned find, any part of the record suggesting that her urinary frequency – "four to five" times "through the day" – at all compromises her ability to hold a job. When she applied for disability benefits, Claimant did not attribute any of her work limitations to urinary frequency and, indeed, did not attribute any work limitations to the side effects of her medication. Tr. 10, 84-88. Claimant instead attributed her inability to work to knee and back pain. Tr. 25, 98, 123. Furthermore, Claimant's medical records do not show that she received any type of treatment or medication for her urinary frequency; the medical records do not show that she even raised the matter of her urinary frequency to her physicians. The closest reference to any type of urological dysfunction that the undersigned could locate was Claimant's statement to Dr. Montijo that she did not have any loss of bowel or bladder control. Tr. 164. When a claimant has not complained of medication side effects, and the record contains no complaints of side effects to treating physicians, there is substantial evidence to support a finding that side effects are not a significant problem. See Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990).

15

Second, the vocational expert testified that even if Claimant had all of the impairments and limitations she alleged at the hearing, including urinary frequency, they "wouldn't keep a person from performing [work as a data entry clerk].[6] Tr. 45.

Third, and most importantly, Claimant managed to hold a full-time job for almost 20 years while on her diuretic medication. More specifically, she was first prescribed her "water pills" in 1986, yet continued to work, first as a data entry clerk and later as a frame attendant, through 2005. Tr. 150. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (absent evidence of significant deterioration, impairment not considered disabling where claimant had previously worked with that same impairment). Claimant's demonstrated ability to work as a data entry clerk for many years while taking her "water pills" rebuts counsel's suggestion that it is a significant impairment.

In sum, the ALJ assessed Claimant's subjective complaints in the context of the entire record. The undersigned concludes that he had substantial evidence upon which to discount the limiting effects of her alleged medication side effects and, in particular, her frequent urination.

_____

[6] The undersigned notes that Claimant's counsel posed to the vocational expert a hypothetical question predicated on a misunderstanding of his client's testimony. Counsel asked the vocational expert if an individual could work as a data entry clerk is she "needed to take four or five unscheduled or urgent bathroom breaks during the course of a work day." Tr. 47. Claimant, however, did not testify that she urinated four to five times during a "work day"; rather, she testified that when she is at home she urinates about four to five times during the day – "through the day I go at least four to five." Tr. 31. The need to urinate four to five times a day cannot be said to render an individual disabled. And even if Claimant had intended to say "work day," the vocational expert indicated that it would not prevent Claimant from working as a data entry clerk.

16

### 2.    Closed Period of Disability

Claimant argues that "since the ALJ implicitly found that the Plaintiff's functional capacity was more limited prior to her total [left] knee replacement and physical therapy, [the ALJ] should have considered the possibility of a closed period of disability"; he suggests a closed period commencing on her alleged disability onset in May 2005 and continuing through the completion of her physical therapy (for the knee replacement) in September 2007. See Plaintiff's Motion at 7 (DE 10).  Claimant's argument is unavailing.

First, for the many reasons set forth in his Decision, the ALJ properly concluded that Claimant has not been under a disability from her alleged disability onset in May 2005 through the date of his decision in March 2008.  Tr. 10-15.  By implication, therefore, Claimant would not be entitled to a closed period of disability at any point during this period.

Second, a close examination of the record makes clear that Claimant's knees – and, in particular, her left knee – did not render her unable to work, as Claimant's argument would suggest, from May 2005 to September 2007.  At a May 2005 examination, Claimant's own treating physician, Dr. Montijo, indicated that "[Claimant] could work <u>full duty</u> as tolerated with her only restrictions being no ladders and no climbing of stairs." Tr. 165 (emphasis added).  Two months later, in July 2005, Dr. Montijo modified his opinion slightly, recommending work restrictions of permanent <u>light duty</u>, including no kneeling, squatting, crawling, crouching, climbing ladders, and unprotected heights. Tr. 162. In July and August 2005, claimant had a series of five injections into her right knee. Tr. 152-59. After completing the series of injections, claimant reported a 60 to 70 percent improvement

17

in her right knee pain and denied any adverse reactions to the treatment. Tr. 152. Dr. Montijo noted that her left knee was in "good order." Tr.156. In October 2005, Dr. Montijo commented that Claimant's right knee was doing very well, and he did not note any problem with her left knee. Tr.151.

In January 2007, Plaintiff reported to Dr. Montijo that her left knee was very unstable, and the examination showed left knee effusion and left knee instability. Tr. 214. Significantly, in February 2007, Claimant reported that the pain in her left knee had actually started in November 2006. Tr. 212. In May 2007, Dr. Montijo performed left total knee arthroplasty revision. Tr. 221-24, 228-30. In June 2007, x-rays showed her left knee prosthesis to be in good order. Tr. 207. She had postoperative wound healing difficulties with bloody fluid draining from her knee incision, and underwent closure of the fistula tract in July 2007. Tr. 201. After this, she underwent physical therapy. Tr. 198. But by September 2007, Dr. Montijo noted that physical examination of Claimant revealed functional and pain free range of motion of the right knee, while range of motion in the left knee was 0-90 degrees and was negative for instability. Tr. 398. X-rays of the right knee showed severe tricompartmental arthritis, with narrowing of the joint space secondary to sclerosis and osteophyte formation, for which Dr. Montijo prescribed pain medication. Tr. 398-99. Later that month (September 2007), Claimant told Dr. Montijo that her left knee was doing very well, but described persistent right knee pain. Tr. 396. On physical examination, the right knee was neurologically grossly intact and was tender to positive crepitus. Tr. 396. Dr. Montijo assessed right knee osteoarthritis and recommended a series of injections for her right knee. Tr. 397. He also offered Plaintiff oral medication,

18

which she deferred. Tr. 397. Upon receiving the injections, Plaintiff reported continued improvement in her right knee. Tr. 392.

Significantly, at no point in time did Claimant's own treating physician, Dr. Montijo, ever indicate that she would be unable to perform sedentary work. Even if Claimant's knee problems might have precluded Claimant from performing all of the functions of a frame operator, which is classified as medium work, none of these restrictions would preclude Claimant from performing the functions of a data entry clerk, which is classified as sedentary work. Tr. 39, 41.

Furthermore, even if Claimant's left knee pain were to have precluded her from the sedentary work of a data entry clerk, it would not have precluded her for the statutory minimum 12-month period that is required to be eligible for disability benefits. See 42 U.S.C. § 423(d)(1)(A) (defining a "disability" as an inability to engage in substantial gainful activity by reason of an impairment that has lasted not less than 12 months). Claimant reported to Dr. Montijo that her left knee pain started sometime in November 2006. Tr. 212. Even assuming that this November 2006 onset of pain was so severe as to preclude her from her sedentary work as a data entry clerk, by September 2007 – only 10 months later – Claimant reported that her knee was doing very well, and Dr. Montijo observed that her range of motion in her left knee was 0-90 degrees and that the knee was negative for instability.    Hence, by Claimant's own statement concerning the onset of her left knee pain, as well as by the medical evidence of record, Claimant could not have been found unable to work for the statutory minimum 12-month time frame to qualify for an award of disability benefits.

19

Finally, the undersigned notes that Claimant never asked the Social Security Administration, either during her application process or in her administrative hearing, to consider awarding a closed period of disability. Tr. 10, 16-48, 84-88. Claimant made this request for the first time following the ALJ's Decision, in her Motion for Summary Judgment.

For the foregoing reasons, therefore, the ALJ did not err in failing to discuss in his hearing Decision Claimant's eligibility for a closed period of disability.

### 3. Claimant's Obesity

Claimant's final argument is that the ALJ erred in failing to properly evaluate her obesity. More specifically, she presents a two-part argument: "The ALJ failed to find that [her] obesity constituted a severe impairment nor did he evaluate [her] obesity under Social Security Ruling 02-1p." Plaintiff's Motion at 8 (DE 10-1).[7] She asks that "[t]his cause . . . be reversed and remanded." Id. at 9.

Claimant first argues that the ALJ erred in failing to find her obesity to be "severe." As Claimant correctly notes, "[o]besity will be considered a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), . . . it significantly limits an individual's physical or mental ability to do basic work activities." Plaintiff's Motion at 8 (DE 10-1) (emphasis added); see also 20 C.F.R. § 404.1520(c). Conversely, an impairment or combination of impairments is not "severe"

---

[7] According to Claimant, her weight of 226 pounds combined with her height of 5'6" translate to a body mass index ("BMI") of 36.5 and a Level II obesity classification under National Institutes of Health guidelines. See Plaintiff's Motion at 9 (DE 10-1).

if it has no more than a minimal impact on an individual's ability to do basic work activities. See 20 C.F.R. § 404.1521(a). "Basic work activities" include such physical functions as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, and speaking. See 20 C.F.R. § 404.1521(b)(1)-(6). A claimant bears the burden of establishing that her impairment or combination of impairments is "severe," as defined by the Social Security Act. See Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987); McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986); Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986). Here, Claimant has not met that burden; she has not shown that her obesity has had any impact on her ability to do basic work activities.

First, Claimant did not sustain her burden of showing that her obesity was "severe" because she never suggested, let alone argued – in her application for disability benefits, in her Disability Report, or in her administrative hearing – that her obesity in any way limited her ability to work; she instead attributed her inability to work solely to knee and back pain. Tr. 25, 84-88, 98-104, 120-23. The ALJ, therefore was "under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003). Despite Claimant's failure to raise this claim, the ALJ considered Claimant's obesity nonetheless. He stated at the hearing that "from [his] review of the file there are indications of . . . obesity," yet in his written Decision he ultimately found that "[a]fter careful consideration of the entire record," Claimant has the RFC for sedentary work. Tr. 12, 19.

Second, Claimant did not sustain her burden of showing that her obesity was

21

"severe" because she has not identified any examining or treating physician who diagnosed her as obese, let alone prescribed treatment or diet for her obesity. Plaintiff's Motion at 8-9 (DE 10-1). Further, the undersigned could only locate one reference to her obesity by an examining or treating physician; Dr. Montijo specifically noted that Claimant, although large breasted, is "[n]ot morbidly obese." Tr. 160 (emphasis added).

Third, Claimant did not sustain her burden of showing that her obesity is "severe" because notwithstanding her history of obesity, she actually worked until May 2005 as a frame attendant, a job that required her to climb ladders, lift heavy objects, stoop, bend, pull and stretch wire, and go up and down stairs. Tr. 25. Additionally, Claimant did not attribute her departure from this job to her obesity. As Claimant's own work history demonstrates, therefore, her obesity did not prevent her from performing a rigorous job that is classified as "medium" work; it therefore would not prevent her from performing "sedentary" work.

Fourth, Claimant did not sustain her burden of showing that her obesity is "severe" because, despite proffering a BMI of 36.5, a body mass index does not correspond with any specific degree of functional loss, as Claimant herself acknowledges. See Plaintiff's Motion at 8 (DE 10); SSR 02-1p.[8]  Severity of a medically determinable impairment is measured in terms of its effect upon ability to work and not in terms of deviation from purely medical standards of bodily perfection or normality. See McCruter v. Bowen, 791

_____

[8] No specific weight or BMI equates with a "severe" or a "not severe" impairment; nor do descriptive terms such as "severe," "extreme," or "morbid" obesity establish whether or not obesity is a "severe" impairment for disability program purposes. SSR 02-1p.

F.2d 1544, 1547 (11th Cir. 1986).

Yet, even if the ALJ did err in not finding that Claimant's obesity is "severe," a remand would not be warranted. A remand based on an ALJ's (allegedly deficient) step two severity assessment is warranted only where the ALJ's step four RFC assessment has failed to consider all of a claimant's impairments, whether severe or not. See Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987) (ALJ's failure to find that claimant's cervical condition was severe could not constitute reversible error because ALJ properly could consider that condition in determining whether claimant had a sufficient RFC to allow him to work); Newsome v. Barnhart, 444 F. Supp. 2d 1195, 1201 (M.D. Ala. 2006) (stating that "[g]iven the ALJ's thorough discussion of the evidence in the record concerning plaintiff's oppositional behavior, the court finds that – to the extent that the ALJ erred in failing to make an explicit determination as to whether plaintiff's secondary diagnosis of ODD [Oppositional Defiant Disorder] constituted a severe impairment at step two of the sequential evaluation – the error was harmless"); Masch v. Barnhart, 406 F. Supp. 2d 1038, 1054 (E.D. Wisc. 2005) (noting that "if the ALJ fulfills this obligation at step four [of considering all severe and non-severe impairments in assessing RFC], any error at step two will likely be harmless"). It bears repeating that here the ALJ explicitly acknowledged in his written Decision that he is under an obligation to "consider all of the claimant's impairments, including impairments that are not severe." Tr. 11 (emphasis added). And at the hearing, he expressly noted that "from [his] review of the file there are indications of . . . obesity." Tr. 19 (emphasis added). Then, at step four of his written Decision, the ALJ found that "[a]fter careful consideration of the entire record" – which, by

23

implication, includes her obesity – Claimant has the RFC for "sedentary work." Tr. 12 (emphasis added). In sum, once the ALJ found that Claimant had some "severe" impairments, he considered all of her impairments at step four – "severe" and "not severe" – as he is required to do. See SSR 96-8p (stating that "[i]n assessing RFC [at step 4], the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'") (emphasis added). That the ALJ here did not classify her obesity as "severe" is therefore harmless.

The second part of Claimant's argument is that the ALJ did not evaluate Claimant's obesity under Social Security Ruling 02-01p. According to Claimant: "SSR 02-01p provides that in the absence of record evidence to the contrary, the ALJ will accept a diagnosis of obesity given by a treating source or by a consultative examiner." Plaintiff's Motion at 8 (DE 10-1) (emphasis added); see also SSR 02-1p. Yet, Claimant has not identified – and the undersigned has not located – the medical reports of any treating source or consultative examiner who ever diagnosed Claimant as obese. Indeed, aside from Dr. Montijo's notation of her breast size and his suggestion that she have a reduction to alleviate stress on her spine, no treating or consulting physician had ever referred to her obesity. Tr. 10, 84-88, 151-165, 198-217, 221-389, 392-99. Indeed, the only express mention of obesity by any physician was as a secondary diagnosis rendered by a non-examining state agency physician, Dr. Robert Kline. Tr. 173-180. SSR 02-1p, however, speaks to Social Security Administration's obligation to give deference to "the judgment of a physician who has examined the claimant," and not to a non-examining physician.

Moreover, even if Dr. Kline were a treating source or a consultative examiner, it

would not follow that his secondary diagnosis of obesity should result in a finding of disability. Indeed, Dr. Kline concluded Claimant was capable of performing "light work"; she can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8 hour workday, sit for a total of about 6 hours in an 8 hour workday, and push and/or pull to an unlimited degree. Tr. 174, 179. Ironically, the ALJ, from whose conclusion Claimant dissents, discounted Dr. Kline's opinion because he "did not have the benefit of actually examining the claimant or considering the record in its entirety" and instead found that Claimant was capable of only "sedentary work," requiring a lesser exertional capacity. Tr. 14.

Because Claimant never alleged and no physician had ever opined that her obesity limited her work in any way, because Claimant's BMI does not correspond with any functional limitations, and because Claimant worked a job requiring a "medium" level of exertion for several years despite her obesity and stopped working for reasons other than her obesity, the ALJ did not err in failing to characterize her obesity as "severe," in failing to accept a diagnosis of obesity from a treating or consulting examiner (when there was none), or in failing to find her unable to work due to her obesity.

## VI.   RECOMMENDATION

Claimant had a fair hearing and full administrative consideration in accordance with the applicable statutes and regulations. Substantial evidence in the record as a whole supports the ALJ's finding that Claimant is not disabled and can perform her past relevant work as a data entry clerk. The ALJ, therefore, correctly concluded that Claimant is not entitled to Disability Insurance Benefits. Accordingly, the undesigned respectfully

RECOMMENDS that Plaintiff's Motion for Summary Judgment (DE 10) be DENIED, that Defendant's Motion for Summary Judgment (DE 13) be GRANTED, and that the Commissioner's decision be AFFIRMED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable James I. Cohn, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the district judge of an issue covered in the report and shall bar the parties from attacking, on appeal, factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. See 28. U.S.C. § 636(b)(1); Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this ⅛¹ day of February 2010.

BARRY S. SELTZER
United States Magistrate Judge

26

Copies to:

Honorable James I. Cohn
United States District Court

Michael A. Steinberg, Esq.
4925 Independence Parkway, Suite 195
Tampa, Florida 33634
Attorney for Claimant Fern Martin

Steven R. Petri, Esq.
Assistant United States Attorney
United States Attorney's Office
500 East Broward Blvd., Suite 700
Fort Lauderdale, Florida 33394